**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

Robert Carter and Sabrina Anderson, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

X.AI Corp. and MZX Tech LLC,

Defendants.

Civil Action No.: 26-3257

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

---

**COMPLAINT**

---

Plaintiffs Robert Carter and Sabrina Anderson ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action complaint against X.AI Corp. ("xAI") and MZX Tech LLC ("MZX") (collectively, "Defendants").

Plaintiffs allege the following:

**INTRODUCTION**

1. The construction of massive data centers and power-generation facilities to support the artificial intelligence ("AI") boom and to generate profits for AI companies and their owners is wreaking havoc on residential communities across the United States. When these facilities are located near quiet residential areas, they subject residents to near-constant noise, vibrations, and other harms that interfere with residents' fundamental right to use and enjoy their properties. This is precisely what is happening on the border between Mississippi and Tennessee, where Defendants are building out a massive gas power plant to power three massive AI data

centers. This large-scale project is already interfering with surrounding residents' ability to use and enjoy their properties, and the harms will only increase as the power plant and the data centers it powers continue to grow in size and scope.

2. Southaven, Mississippi, is a suburban community in the northwestern corner of the state just south of the border from Memphis, Tennessee. Adjacent to Southaven are the suburban residential communities of in the southern part of Memphis, including Whitehaven, Tennessee. For decades, Plaintiffs and their neighbors enjoyed the calm and quiet nature and small-town charm of these communities. They were accustomed to sleeping, conversing, entertaining, and enjoying their homes and outdoor spaces, together with family, friends, and neighbors.

3. In mid-2025, Defendants began operating loud and polluting gas-fired turbines at 2875 Stanton Road South (the "Southaven Plant" or "2875 Stanton Road").

4. Defendants installed these gas-fired turbines to power massive AI data centers that Defendants own and operate in and around Memphis. These data centers house the computers that are used to train and run xAI's AI tools, including its large language model, Grok.

5. The first two of these data centers, "Colossus I" and "Colossus II," are located in Memphis, Tennessee. Defendants are building two additional data centers, "MACROHARDRR," spanning over 810,000 square-feet on Stateline Road in Southaven, and "Minihard," a more compact but equally powerful facility on Tulane Road in Whitehaven, Tennessee. And they have purchased a series of related properties to support these facilities, including a water recycling facility in a Memphis industrial park near Colossus I.[1]

[1] Plaintiffs collectively refer to the Southaven Plant, Colossus I, Colossus II, MACROHARDRR, and Minihard as Defendants' "Facilities."

6. In less than a year, Defendants increased the number of gas-fired turbines on site by 2,300%. As Defendants increased the number of turbines from 3 to 18 between August and September of 2025, community members had already shared their concerns about the constant noise with the media, police, and local government. Defendants continued to increase the number of turbines – first to 27, and eventually to 69.[2] Defendants have relied on these "temporary" turbines for the last year, and will continue to rely on them at least until July of 2027.[3] And as explained below, xAI is already in the process of installing "permanent" turbines to power the expanding data centers.

7. As the number of turbines and the size of the data centers have grown, so has the persistent and intrusive noise that emanates from the Facilities —24 hours a day, 7 days a week.

8. The noise generated by the Facilities includes a distinctive combination of high-pitched squealing, continuous engine roaring, low-frequency rumbling, and tonal humming or whining that travels across property lines and into area homes in Memphis, including Whitehaven. It can also be felt as a physical vibration. The presence of this noise is pervasive and inescapable, especially at night when other noises in the indoor and outdoor environment are quiet.

9. Residents, who must endure this noise at all hours of the day and night, have described it as being like a "jet engine." As one resident explained, "This is heard at night when I'm trying to go to sleep, and I hear it when I wake up," resulting in loss of sleep, headaches, and

[2] Disha Raychaudhuri and Valerie Volcovici, *Pollution from Musk's unpermitted xAI power project hits hardest in Black communities*, Reuters (July 14, 2026), https://www.reuters.com/world/americas/pollution-musks-unpermitted-xai-power-project-hits-hardest-black-communities-2026-07-14/; *SpaceXAI's Greater Memphis Area Updates*, XAI (Jul. 30, 2026), https://x.ai/memphis/updates.
[3] *SpaceXAI's Greater Memphis Area Updates*, XAI (Jul. 30, 2026), https://x.ai/memphis/updates.

persistent ringing in the ears.[4]

10. The constant noise and accompanying vibration from the Facilities interferes with Plaintiffs' and area residents' daily life and well-being. It prevents the ordinary use and enjoyment of both their indoor and outdoor living spaces in their places of residence, including by disrupting their sleep. Activities that were once routine like sitting or dining outside, opening windows, relaxing indoors, or resting at night have been materially impaired or rendered impossible by the continuous industrial noise and vibration.

11. And Defendants are just getting started. In March of 2026 – just three weeks after Mississippi's only public hearing on the Southaven Plant project – MDEQ issued xAI permits to install 41 "permanent" turbines, which xAI claims will replace the 69 "temporary" turbines currently on site.[5] The build-out of the Facilities is massive. Defendants have erected large fences, and guards dressed in camouflage block the construction entrances, but the sheer scope of construction is plain to see and hear. Forests and vegetation that used to help buffer the Facilities from nearby residents are being razed. Large cranes are on site and used to build out the Facilities, including installing new gas turbines and loud fans. Other machinery is delivered at all hours by semi-trailer trucks and other industrial trucks. Defendants' large-scale project has caused dust, ash, and other particles to enter into and settle on local residents' cars and outdoor

---

[4] Garner Montgomery, *Residents Oppose xAI Southaven Turbines Permit at MDEQ Hearing*, Action News 5 (Feb. 17, 2026), https://www.actionnews5.com/2026/02/18/residents-oppose-xai-southaven-turbines-permit-mdeq-hearing/; *see also* Neil Strebig & Jacob Wilt, *Crowd Pushes Back Against xAI Turbines in Southaven During Hearing*, Com. Appeal (Feb. 17, 2026), https://www.commercialappeal.com/story/money/business/development/2026/02/17/xai-in-southaven-turbines-permit/88402053007/?gnt-cfr=l&gca-cat=p&gca-uir=true&gca-epti=z115244pl173501116450cl17350e000100vl15244d--38--b--38--&gca-ft=l73&gcads=sophi; Alex Rozier, *Public Gives Resounding 'No' to Proposed xAI Southaven Permit*, Miss. Today (Feb. 18, 2026), https://mississippitoday.org/2026/02/18/xai-southaven-permit-public-resounding-no/.

[5] *Id.*; *SpaceXAI's Greater Memphis Area Updates*, XAI (Jul. 30, 2026), https://x.ai/memphis/updates.

spaces, and even enter inside their homes.

12. As a result of Defendants' ongoing and continuous operation of the Facilities, Plaintiffs and class members have suffered and will continue to suffer harm, including diminution in the value of their properties and substantial and unreasonable interference with the use and enjoyment of their properties due to substantial annoyance, emotional distress including anxiety, increased stress and irritability, sleep disruption, fatigue and impaired concentration, and nuisance-level physical symptoms such as headaches, nausea, and tinnitus.

13. Plaintiffs bring this suit on behalf of themselves and other Tennessee residents and property owners similarly affected by the Facilities ("Class Members") to seek redress, including abatement, for these harms.[6]

## PARTIES

14. Plaintiff Robert Carter is domiciled in Tennessee and resides in the "Class Area" defined in paragraph 176 below. Plaintiff Carter has been harmed, and continues to be harmed, by Defendants' operation of the Facilities. Plaintiff Carter is a member of and seeks to represent the proposed Class.

15. Plaintiff Sabrina Anderson is domiciled in Tennessee and resides in the "Class Area" defined in paragraph 176 below. Plaintiff Anderson has been harmed, and continues to be harmed, by Defendants' operation of the Facilities. Plaintiff Anderson is a member of and seeks to represent the proposed Class.

16. Defendant xAI is an artificial intelligence company incorporated in the state of Nevada with a principal place of business in California at all relevant times. Its office address is 1450 Page Mill Road, Palo Alto, California. xAI is thus a citizen of Nevada and California.

[6] Plaintiffs do not assert any claims for personal injuries.

17. Defendant MZX is a limited liability company (LLC) organized in the state of Wyoming, with a principal place of business in California at all relevant times. Its office address is 1450 Page Mill Road, Palo Alto, California.

18. xAI is the managing member of MZX, and upon information and belief, its sole member, making MZX a citizen of Nevada and California.

19. MZX shares an office address with xAI.

20. MZX and xAI share management, representatives, and/or operational personnel.

21. All Defendants conduct substantial and continuous business within the State of Tennessee and this District, including by directly or indirectly owning, leasing, managing, and/or operating the Colossus I, Colossus II, and Minihard data centers in Memphis, and deriving revenues from operations within this District.

## JURISDICTION AND VENUE

22. Subject matter jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because at least one proposed class member is a citizen of a state different from at least one Defendant (Plaintiffs and other members of the proposed class are citizens of Tennessee, while xAI and MZX are citizens of Nevada and California); the proposed class contains more than 100 members; and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

23. Personal jurisdiction is proper over Defendants because they have purposefully availed themselves of the privilege of conducting business in Tennessee by locating and operating most of the Facilities, including the Colossus I, Colossus II, and Minihard data centers, in Tennessee. Plaintiffs' and other proposed Class Members' injuries arise from Defendants' activities at the Facilities, and such injuries were foreseeable to Defendants.

24. Working together, xAI and MZX both directly participated in siting the Facilities

in residential Memphis, Whitehaven, and Southaven, and in operating, and rapidly expanding, the Facilities.

25. On July 16, 2025, MZX—a newly formed entity[7]—purchased 114.49 acres of property at 2875 Stanton Road in Southaven for $10 and "other good and valuable consideration."[8]

26. Upon information and belief, MZX was formed specifically to facilitate transactions, such as the 2875 Stanton Road purchase, at the direction of xAI.

27. Upon information and belief, MZX is operated by xAI employees.

28. Shortly after MZX's acquisition of the property at 2875 Stanton Road, Darren Musselwhite, the Mayor of Southaven, announced xAI's expansion in Southaven to its residents stating: "xAI and Southaven, Mississippi, a great partnership now and into the future!"[9]

29. Brent Mayo, an xAI Senior Manager who provided oversight for operations at xAI's facilities in and around Southaven, publicly confirmed xAI's presence in Southaven.[10]

30. Michael Liberatore, then the Chief Financial Officer of xAI and MZX, executed two transmission line easement agreements to facilitate operations at the Southaven Plant.[11]

---

[7] MZX Tech LLC did not exist until May 16, 2025, when its Articles of Incorporation were filed with the Wyoming Secretary of State.

[8] *See Special Warranty Deed from Julie M James to MZX Tech LLC* (dated July 16, 2025) (recorded July 18, 2025), *reprinted in* 1025 DeSoto Cnty. Records, Warranty Deed, 13703-06; Bob Bakken, *xAI Buys Southaven Property*, DeSoto Cnty. News (July 18, 2025), https://desotocountynews.com/desoto-county-news/xai-buys-southaven-property/.

[9] Melitta Duncan, *xAI Southaven,* Southaven: Mayor's Report (Aug. 1, 2025), https://southaven.org/Blog.aspx?IID=220.

[10] *See* Harrison Klopp, *xAI Exec Not Disclosing Plans for Southaven, MS Site,* News Channel 3 (July 15, 2025), https://wreg.com/news/local/xai-memphis/xai-exec-not-disclosing-plans-for-southaven-ms-site/; Kate Bieri, *xAI Confirms FOX13 Investigation into Southaven Site,* FOX13 (July 15, 2025), https://www.fox13memphis.com/news/xai-confirms-fox13-investigation-into-southaven-site/article_c1c06ba0-9b3c-4e3c-a791-24764d1fe28a.html.

[11] *See Transmission Line Easement Agreement from MZX Tech LLC to Stanton Road Peak Properties LLC* (dated July 16, 2025) (recorded July 18, 2025), *reprinted in* 1025 DeSoto Cnty.

31. Mayo, of xAI, has represented MZX and xAI in discussions with the MDEQ and the public relating to the Southaven site.

32. xAI and MZX working together in the Memphis area is the norm. Property records from DeSoto County indicate that MZX purchased the "MACROHARDRR" site at 2400 Stateline Road in Southaven on December 17, 2025.[12] Elon Musk, as President of xAI, made clear xAI's critical role in the MACROHARDRR acquisition and operation, stating: "xAI has bought a third building called MACROHARDRR. Will take @xAI training compute to almost 2GW."[13]

33. Upon information and belief, xAI employees work at the Facilities. xAI lists on its website numerous job openings in Southaven for roles including "Data Center Operations Technician," "Facilities Operations Technician," "Mechanical Commissioning Technician," "Operations & Maintenance Technician," "Power Generation Engineer" and "Construction Superintendent (Night Shift), Power Generation Plant." xAI's listing for a Construction Superintendent in Southaven notes that the applicant must be "[c]omfortable working outdoors/in industrial environments at night with noise[.]"[14]

34. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of events or omissions giving rise to the claims in suit occurred in Tennessee,

---

Records, Warranty Deed, 13707-19; *Transmission Line Easement Agreement from ET Southaven V LLC to MZX Tech LLC* (dated June 30, 2025) (recorded July 1, 2025), *reprinted in* 1025 DeSoto Cnty. Records, Warranty Deed, 12656-86.

[12] *See Special Warranty Deed from ET Southaven V, LLC to MZX Tech LLC* (dated Dec. 17, 2025) (recorded Dec. 23, 2025), reprinted in 1025 DeSoto Cnty. Records, Warranty Deed, 24710-15.

[13] Elon Musk (@elonmusk), X (Dec. 30, 2025, at 4:00 ET), https://x.com/elonmusk/status/2006108047609930069.

[14] *Construction Superintendent (Night Shift), Power Generation Plant, xAI*, https://perma.cc/UHX5-VUN9 (retrieved May 12, 2026).

within this District.

## GENERAL FACTUAL ALLEGATIONS

### I. **The perceived demand for increased computational power has caused a data center construction frenzy.**

35. A data center is a physical facility that houses and runs large computer systems.[15] They have existed in some capacity for years and enable a wide range of digital services, including cloud computing, online commerce, financial transactions, and streaming services.

36. Over the past decade, the data center industry has expanded rapidly. This exponential growth has been driven by a perceived increased demand for data storage and processing capacities capable of handling intensive computational tasks—such as AI development and deployment.

37. To meet this perceived demand and to generate profits for themselves, data-center developers and investors are aggressively developing new facilities worldwide in what has been called a "global construction frenzy."[16] An estimated hundreds of billions of dollars were spent on data center development in 2025 alone.

38. Amid this "frenzy", the United States has emerged as a global hub for data centers. The number of U.S. data centers has nearly doubled in recent years, increasing from roughly 2,600 facilities in 2021[17] to over 4,000 by 2025.[18]

---

[15] CRS Report R48646, *Data Centers and Their Energy Consumption: Frequently Asked Questions*, by Martin C. Offutt *et al.*, at 1.

[16] Cyrus Farivar, *Investment in Data Centers Worldwide Hit Record $61 bn in 2025, Report Finds*, The Guardian (Dec. 19, 2025), https://www.theguardian.com/technology/2025/dec/19/data-centers-ai-investment.

[17] *See* Brian Daigle, *Data Centers Around the World,* U.S. Int'l Trade Comm'n (2021), https://www.usitc.gov/publications/332/executive_briefings/ebot_data_centers_around_the_world.pdf.

[18] *See USA Data Centers,* Data Center Map, https://www.datacentermap.com/usa/ (last visited June 2, 2026).

39. AI models—especially large language models and other generative systems like xAI's Grok—are built using artificial neural networks that are trained on extremely large amounts of data. Unlike traditional software programs, these systems require continuous, highly intensive computing power to function.

40. Companies meet these intensive computing demands through thousands of high-performance servers housed within data centers. Each server uses advanced processors, such as graphics processing units (GPUs) or similar AI-focused chips, designed to perform the large number of mathematical calculations needed for machine learning.

41. Connecting tens of thousands of GPUs together in coordinated groups on densely packed server racks allows them to work at the same time to train and run AI models and perform other tasks more efficiently. The scale and intensity of this processing far exceed typical business or office computing, requiring the construction of "hyperscale" data centers that occupy at least 10,000 square feet of physical space.[19]

42. To keep up with operational computing demands, accelerate AI model development, and generate revenue, data centers typically run around the clock—24 hours a day, 7 days a week. This requires vast amounts of energy. Hyperscale data centers can consume hundreds of megawatts of electricity—for comparison, 100 megawatts is sufficient to support the electricity needs of approximately 80,000 U.S households.[20]

43. In 2024 alone, U.S. data centers consumed approximately 183 terawatt-hours of

[19] CRS Report R48646, *Data Centers and Their Energy Consumption: Frequently Asked Questions*, by Martin C. Offutt *et al.*, at 1-2.
[20] *Id.* at 2.

electricity, accounting for more than 4% of total U.S. electricity use.[21] Forecasts from the U.S. Department of Energy indicate that data centers will consume as much as 580 terawatt-hours annually in 2028, representing up to 12% of total U.S. electricity consumption.[22]

44. Defendants' data centers in Memphis and Southaven—home to the "world's biggest supercomputer," which was built in just 122 days, "outpacing every estimate"[23]—are no exception. They require massive amounts of energy to operate. The gas-fired turbines at the Southaven Plant supply energy required to power these operations.

## II. <u>Large data centers require constant power, and generate unrelenting heat and noise.</u>

45. To produce the massive amount of electric power required to operate a large data center, many data center developers are constructing their own power plants, including those using gas-fired turbines or engines, to secure a stable and uninterrupted power supply.[24]

46. These systems are often installed as emergency backup generators, which are designed to operate only during electrical grid outages or for limited testing—not for continuous operation.[25]

47. Defendants, however, run the gas-powered turbines at the Southaven Plant near continually as the primary power source for their data centers in and around Memphis and Southaven.

---

[21] *See* Rebecca Leppert, *What We Know About Energy Use at US. Data Centers Amid the AI Boom*, Pew Research Center (Oct. 24, 2025), https://www.pewresearch.org/short-reads/2025/10/24/what-we-know-about-energy-use-at-us-data-centers-amid-the-ai-boom/.
[22] *See* Miguel Yanez-Barnuevo, *Data Center Energy Needs Could Upend Power Grids and Threaten the Climate*, Env't & Energy Study Inst. (Apr. 15, 2025), https://www.eesi.org/articles/view/data-center-energy-needs-are-upending-power-grids-and-threatening-the-climate.
[23] *Colossus*, xAI, https://x.ai/colossus (last visited June 2, 2026).
[24] CRS Report R48762, *Data Center Energy Infrastructure: Federal Permit Requirements*, by Paul W. Parfomak *et al.*, at 6-7.
[25] *Id.* at 6.

48. Gas-powered turbines generate electricity by igniting a mixture of compressed air and fuel, creating a continuous stream of hot, high-pressure gas that spins the turbine and drives the generator to produce electricity. This combustion process produces substantial heat as a byproduct of the turbine's operation.

49. Facilities that rely upon gas-fired turbines for energy require extensive cooling, ventilation, and exhaust systems to dissipate and manage the heat produced by the combustion process.[26] These heat-rejection systems can include large industrial-scale radiators, loud ventilation systems, loud cooling units, and loud high-capacity exhaust stacks, all of which operate continuously or during extended periods of peak demand.[27]

50. Both the gas-powered turbines used to supply electricity to AI data centers and the associated turbine cooling equipment generate persistent and significant noise.

51. The noise created by these systems is distinctive and intrusive, often described as a combination of high-pitched squealing, continuous engine roar, low-frequency rumbling, and tonal humming or whining, caused by internal combustion engines, exhaust systems, cooling fans, and mechanical vibration.

52. In addition to the noise that is easily perceived by the human ear, these systems also generate low-frequency noise that manifests similarly to physical vibrations and can be felt in the body (similar to how you can sometimes feel the bass of a song in your chest).[28] These

---

[26] *See How Gas Turbine Power Plants Work*, U.S. Dep't of Energy, https://www.energy.gov/hgeo/how-gas-turbine-power-plants-work (last visited June 2, 2026); *Stationary Gas and Combustion Turbines*, U.S. Env't Prot. Agency (Jan. 15, 2026), https://www.epa.gov/stationary-sources-air-pollution/stationary-gas-and-combustion-turbines-new-source-performance.

[27] *See* Patrick Saussus, *Major Noise Sources and Mitigation Cost Estimates for Gas-Fired Power Facilities*, Power (Oct. 1, 2012), https://www.powermag.com/major-noise-sources-and-mitigation-cost-estimates-for-gas-fired-power-facilities.

[28] *See Data Center Noise Reduction*, Industrial Noise & Vibration Centre, https://invc.com/noise-control/data-center-noise-attenuation/ (last visited June 2, 2026); H. Møller & C.S. Pedersen, *Hearing at Low and Infrasonic Frequencies*, 6 Noise Health 37, 38 (2004).

vibrations may be transmitted through building structures or the ground, depending on the scale and configuration of the facility, and can be perceived indoors even when exterior sound levels appear moderate.

53. When gas-fired turbines and their extensive cooling infrastructure are located near residential communities, as with Defendants' Facilities, residents can suffer from inescapable noise and vibrations resulting in diminution in the value of their property and significant impairments to quality of life and enjoyment of their property, such as substantial annoyance, emotional distress including anxiety, increased stress and irritability, sleep disruption, fatigue, and impaired concentration, and nuisance-level physical symptoms such as headaches, nausea, and tinnitus.

54. When gas turbines and associated cooling systems operate 24 hours a day, 7 days a week—as they generally do at Defendants' Facilities—the noise is also constant. Unlike typical commercial or industrial operations that reduce activity after business hours, there is no respite, interfering with residents' ability to sleep at night inside of their own homes.

55. Industry participants, including Defendants, have long been aware that data centers and gas-fired turbines generate significant and pervasive noise.

56. Although large-scale data centers are a relatively recent development, public reporting of noise disturbances associated with such facilities emerged almost as soon as they began operating.

57. As early as 2018, 300 residents in Chandler, Arizona, signed a petition asking the city to stop a high-pitched humming noise coming from a data center.[29]

[29] John Genovese, *Chandler Residents Frustrated over Humming Noise*, ABC15 (Apr. 20, 2018), https://www.abc15.com/news/region-southeast-valley/chandler/chandler-residents-frustrated-over-humming-noise.

58. Other operators of data centers used for AI and cryptocurrency mining have faced litigation due to the noise emanating from their facilities and associated equipment.[30]

59. As companies continue to build data centers and associated power-generation facilities in communities across the country, noise complaints are increasing.[31]

60. It is widely recognized in industry and engineering literature that gas-powered turbines are inherently loud machines.[32]

61. Defendants knew or should have known that constructing and operating their Facilities would generate substantial noise, vibrations, and particles such as ash and dust, interfering with area residents' use and enjoyment of their properties, diminishing their property values, and causing other nuisance-related harms. Put another way: the harms that are the subject of this lawsuit were foreseeable to Defendants even before they arrived in the region.

## III. **Whitehaven is a historically quiet, residential community.**

62. Whitehaven is a suburban, residential community in Southern Memphis, Tennessee.

---

[30] *See, e.g.*, Vince Sims, *Some Granbury residents file lawsuit against bit mining company over noise pollution*, NBCDFW (Oct. 10, 2024), https://www.nbcdfw.com/news/local/granbury-residents-file-lawsuit-bit-mining-company-noise-pollution/3667717/; Gabriel J.X. Dance, *Anxiety, Mood Swings and Sleepless Nights: Life Near a Bitcoin Mine*, N.Y. Times (Feb. 3, 2024), https://www.nytimes.com/2024/02/03/us/bitcoin-arkansas-noise-pollution.html.

[31] *See, e.g.,* Ariel Wittenberg, *A Data Center Opened Next Door. Then Came the Pitched Whine*, Politico (Mar. 11, 2026), https://www.politico.com/news/2026/03/11/data-centers-ai-electricity-virginia-00815219; Miguel Yanez-Barnuevo, *Communities Are Raising Noise Pollution Concerns About Data Centers*, Env't & Energy Study Inst. (Mar. 3, 2026), https://www.eesi.org/articles/view/communities-are-raising-noise-pollution-concerns-about-data-centers.

[32] *See, e.g.*, Ben Cazzolato et al., *Environmental Noise from Open-Cycle Gas Turbines*, 29th International Congress on Sound and Vibration (Apr. 2023), https://www.researchgate.net/publication/370299657; V.B. Tupov & A.A. Taratorin, *Features of noise radiation from gas turbines*, J. of Phys.: Conference Series (2020), https://iopscience.iop.org/article/10.1088/1742-6596/1683/4/042089.

63. The first settlers arrived in Whitehaven in 1818.[33] After the completion of the Mississippi and Tennessee Railroad in 1856, a station stop was constructed and named "White's Station" after Colonel Francis White, the president of the railroad company.[34] The named changed over time to "White's Haven," and eventually "Whitehaven."[35] Whitehaven was officially annexed by Memphis in 1969.[36] Nevertheless, "the community maintains a distinct identity founded on small business and home ownership."[37]

64. Boasting the charm of its residential communities, Whitehaven advertised itself as having "big town convenience[,] small town qualities…."[38]

65. Today, Whitehaven has a population of approximately 39,100 residents across over 18,500 households.[39] The city has a relatively young population, with a median age of approximately 35 years old.[40] To this day, Whitehaven has the highest per capita income of African-Americans in Tennessee and the most African-American college graduates.[41]

66. Public parks and recreational facilities are a center of community and cultural life in Whitehaven. In 1994, Jean Carnes Sinclair sold property to the city of Memphis to turn it into a local park.[42] The park was named in honor her father, David Carnes, a blacksmith who

---

[33] Erica Horton, *More than Graceland: Whitehaven's 200-year history*, Common Ground (Jan. 11, 2018), https://fromcommonground.com/whitehavenhistory/.
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *ZCTA5 38116*, U.S. Census Bureau, https://data.census.gov/profile/ZCTA5_38116?g=860XX00US38116#populations-and-people (last visited July 30, 2026).
[40] *Id.*
[41] Nancy Henderson, *Reflections of Whitehaven*, BetterTennessee (May 22, 2028), https://bettertennessee.com/david-carnes-park-whitehaven/.
[42] *Id.*

purchased the land in 1918 and was one of the first Black Americans to purchase property in Whitehaven.[43]

67. In 2018, Blue Cross Blue Shield of Tennessee spent $5.4 million to renovate the nine-acre park with features for residents of all ages, including a walking trail, splash pad, track, obstacle course, and blacksmith play area to continue to honor David Carnes.[44]

68. Collectively, Whitehaven's public parks, historic neighborhoods, and focus on supporting local business and home ownership all contribute to its character as a primarily residential community where families thrive and residents enjoy regular access to outdoor recreation and community life.

**IV. <u>Defendants' Facilities operate in violation of Memphis's noise ordinance.</u>**

69. The Memphis Code of Ordinances ("the Memphis Code") applies to Defendants' Facilities by virtue of the Colossus I, Colossus II, and Minihard data centers' location within Memphis.

70. The Memphis Code provides that "[t]he creating of any unreasonably loud, disturbing and unnecessary noise within the limits of the city is prohibited. Any noise of such character, intensity, or duration as to be detrimental to the life or health of any individual, or in disturbance of the public peace or welfare is prohibited." Sec. 9-68-1.

71. The continuous operation of Defendants' Facilities in Memphis and the resulting noise renders it unreasonable and disturbing to the public peace and welfare, in violation of Memphis' noise ordinance.

---

[43] *Id.*

[44] Joyce Peterson, *A look at Whitehaven's new multi-million dollar park*, WMC Action News 5 (Jul. 9, 2019), https://www.actionnews5.com/2019/07/10/look-whitehavens-new-multi-million-dollar-park/.

## V. <u>Defendants have quickly expanded operations throughout the Southern Memphis region.</u>

72. Founded in 2023, xAI positioned itself as a cutting-edge AI company focused on developing and deploying advanced large-scale AI models. Its principal large language model is Grok, a self-described "truth-seeking AI companion for unfiltered answers with advanced capabilities in reasoning, coding, and visual processing."[45]

73. In June 2024, xAI announced its plans to build the world's largest AI supercomputer in Memphis, Tennessee.[46]

74. xAI claims it was told Colossus I would take at least 24 months to build. Unsatisfied with that timeline, xAI has boasted that it "took the project into [its] own hands" "removed whatever was unnecessary" and built Colossus I in just four months.[47]

75. Colossus I is located at 3231 Paul R. Lowry Road in Memphis, beside the historically Black community of Boxtown.

76. Within a few months of Colossus I launching, members of the public in the greater Memphis area discovered that xAI was powering Colossus I with 35 temporary gas-powered turbines.[48] Community members were immediately concerned about the pollution potential of these unregulated energy sources.

77. Over the course of the next year, neighbors and community groups in the greater Memphis area raised concerns about the turbines' harmful emissions, including noise pollution,

---

[45] *Grok*, xAI, https://x.ai/grok (last visited June 2, 2026).
[46] *See Velocity Meets Potency: xAI Announces Memphis As New Home*, Greater Memphis Chamber (June 6, 2024), https://memphischamber.com/blog/press-release/velocity-meets-potency-xai-announces-memphis-as-new-home/.
[47] *Colossus*, xAI, https://x.ai/colossus (last visited June 2, 2026).
[48] Bojan Stojkovski, *Elon Musk's xAi Criticized over Unauthorized Gas Turbines at Memphis Facility*, Interesting Eng'g (Apr. 13, 2025), https://interestingengineering.com/innovation/elonmusk-xai-unauthorized-gas-turbines-memphis.

as well as the lack of transparency and accountability from xAI.[49] xAI continued operations in Memphis without significant mitigation measures.

78. In March 2025, against the backdrop of community resistance against Colossus I's operations, xAI prepared to build a second data center—Colossus II—at 5420 Tulane Road in Whitehaven, Tennessee.[50] xAI's senior manager for infrastructure explained that xAI would be "copying and pasting" what it did at Colossus I, indicating the company would again rely on numerous temporary gas-powered turbines.[51]

79. In July 2025, MZX, acting at the direction of xAI, acquired the property located at 2875 Stanton Road in Southaven, Mississippi—now the site of the Southaven Plant.

80. This site was once occupied by a Duke Energy power plant, which ceased

---

[49] *See* Tracy O'Neill, *Fighting Giants: Standing with Memphis to Stop Pollution and Protect the People*, S. All. for Clean Energy (April 24, 2025), https://cleanenergy.org/news/fighting-giants-standing-with-memphis-to-stop-pollution-and-protect-the-people/ (noting that Musk's methane-gas turbines for Colossus data center "will add more air pollution, noise, and stress to an already overburdened community"); Patrick Sisson, *In Memphis, an Al Supercomputer From Elon Musk Stirs Hope and Concern*, Bloomberg (July 25, 2024), https://www.bloomberg.com/news/features/2024-07-25/in-memphis-elon-musk-s-xai-supercomputer-stirs-hope-and-concern (noting cryptocurrency mines and data centers like Musk's proposed Colossus facility bring "community pushback over noise pollution"); *Musk's xAI Operating Gas Turbines Without Permits at Data Center, Environmental Group Says, Reuters* (Aug. 28, 2024), https://www.reuters.com/business/environment/musks-xai-operating-gas-turbines-without-permits-data-center-environmental-group-2024-08-28; Adrian Sainz, *NAACP, Environmental Group Notify Elon Musk's xAI Company of Intent to Sue Over Facility Pollution*, Associated Press (June 17, 2025), https://apnews.com/article/memphis-xai-elon-musk-pollution-naacp-571c16950259b382f9eae61bd59260ef.

[50] *Elon Musk's xAI Buys New Property in Memphis Amid Supercomputer Expansion*, Reuters (Mar. 7, 2025), https://www.reuters.com/technology/artificial-intelligence/elon-musks-xai-buys-new-property-memphis-amid-supercomputer-expansion-2025-03-07/; Matthew Gooding, *Elon Musk's xAI Buys 1 Million Sq Ft Site for Second Memphis Data Center*, Data Center Dynamics (Mar. 10, 2025), https://www.datacenterdynamics.com/en/news/elon-musks-xai-buys-one-million-sq-ft-site-for-second-memphis-data-center/.

[51] Neil Strebig, *xAI Official Updates Colossus 2 Plans in Memphis, but Not How Site Will Be Powered*, Memphis Com. Appeal (July 15, 2025), https://perma.cc/G8FV-PSPY.

operating in 2003.[52]

81. During the summer of 2025, Defendants met with MDEQ to discuss their plans for building a 1.2 GW simple-cycle combustion turbine power plant at the Southaven Plant. This power plant would provide energy to xAI' s nearby data centers, including Colossus I and II.

82. In an apparent quid pro quo, Defendants donated $1.3 million to the Southaven Police Department in February 2026.[53] Defendants have also offered a substantial discount for their internet service, Starlink, for residents in the Memphis region, up to half-price off.

83. Before Defendants received a permit for that power plant, Defendants began using portable gas-fired combustion turbines at the Southaven Plant to provide power to Colossus II in the interim.

84. At the time Defendants first began operating the Facilities, Defendants knew or should have known they would generate substantial and continual noise and vibration, along with dust and ash, that would harm nearby residents, interfere with the use and enjoyment of their homes, and diminish their property values—all to the detriment of the Whitehaven and other Southern Memphis communities.

85. Upon information and belief, Defendants undertook no analysis of the noise they knew or should have known that their gas-powered turbines would generate, and took no measures to mitigate such anticipated noise, prior to or at the opening of the Facilities.

## VI. xAI's secretive entrance to the region delayed, but did not deter, community resistance.

86. Residents of Whitehaven and Southern Memphis did not become aware of

---

[52] Jacob Gallant, *xAI Buys Former Power Plant in Southaven*, Action News 5 (July 18, 2025), https://www.actionnews5.com/2025/07/18/xai-buys-former-power-plant-southaven/.
[53] Laura Fichten, *Mississippi homeowners blame a noisy data center plant for sleepless nights. The mayor's advice? Consider selling*, (July 16, 2026), https://www.cbsnews.com/news/mississippi-elon-musk-xai-data-center-power-plant-noise/.

Defendants' plans for their community until those plans were well underway.

87. No public announcement was made regarding MZX's purchase of 2875 Stanton Road.

88. The purchase was not discussed at any meetings of the Mayor and the Board of Aldermen of Southaven preceding the sale. Upon information and belief, the purchase was not discussed at any planning commission meetings prior to the sale.

89. Residents had no notice of the impending intrusion, nor did they have an opportunity to voice their concerns.

90. Instead, residents learned of Defendants' plans for the Southaven Plant in or around July of 2025 through news reports.

91. In July 2025, xAI employees were observed on the site at 2875 Stanton Road South.[54]

92. That same month, Brent Mayo, an xAI employee who also acted on behalf of MZX, told news reporters that xAI had a "presence" at 2875 Stanton Road South, but that "we are not publicly discussing what's happening there."[55]

93. On August 1, 2025, Southaven's Mayor, Darren Musselwhite, confirmed in a Facebook post that xAI had "unveiled plans to make Southaven, Mississippi their next key

---

[54] *See* Kate Bieri, *FOX13 Investigates Spots Evidence of xAI Work at Former Powerplant in Southaven*, FOX13 (July 14, 2025), https://www.fox13memphis.com/news/fox13-investigates-spots-evidence-of-xai-work-at-former-powerplant-in-southaven/article_18d98f79-63e5-411f-b647-cd046eaf0957.html.

[55] *See* Kate Bieri, *xAI Confirms FOXJ 3 Investigation into Southaven Site*, FOX13 (July 15, 2025), https://www.foxl3memphis.com/news/xai-confirms-foxl3-investigation-into-southaven-site/article_c1c06ba0-9b3c-4e3c-a791-24764dlfe28a.html; Harrison Klopp, *xAI Exec Not Disclosing Plans for Southaven, MS Site*, News Channel 3 (July 15, 2025), https://wreg.com/news/local/xai-memphis/xai-exec-not-disclosing-plans-for-southaven-ms-site/.

expansion for artificial intelligence operations."[56]

94. After learning of those plans, Southaven residents began contacting their elected officials, raising concerns about pollution, including industrial noise pollution, and the proximity of the Southaven Plant to homes, schools, and community spaces.

## VII. <u>The operation of Defendants' facilities harms residents, and the harms will only increase.</u>

95. The community's concerns were soon proved correct. When the Southaven Plant became operational in or about August of 2025, residents, including those in Tennessee, were subjected to continuous noise, including persistent rumbling, whining, and low-frequency vibrations.

96. Since that time, the noise and vibrations have only escalated in both character and intensity, as Defendants have increased the number of turbines operating at the Southaven Plant.

97. Between August and September of 2025, Defendants increased the number of turbines on-site from 3 to 18, for a combined total power output of 400.5 MW.

98. Aerial photographs confirmed that as of October 31, 2025, there were 18 gas turbines on site.

[56] Mayor Musselwhite (@MayorMusselwhite), Facebook (Aug. 1, 2025), https://www.facebook.com/MayorMusselwhite/posts/pfbid0312ogFJVciDWnvjoYTuipUNzEsFsFMUqvQSZt9DDun9KH97NysphFPJ8diVwZXv9ul.



*Figure 1.* Aerial view of xAI's Stanton Road S. facility (Oct. 31, 2025; Steve Jones/SouthWings).

99. Thermal imaging captured on October 31, 2025, demonstrates that at least 9 turbines were operating at the time.



*Figure 2.* Thermal camera image of xAI's Stanton Road S. facility (Oct. 31, 2025; Steve Jones/SouthWings).

100. In November 2025, Jason Haley, a Southaven resident of more than twenty years, told reporters that the leaf blower-like noise would drone on day and night.[57] He added, "I can't

[57] Alex Rozier & Katherine Lin, *Southaven Residents Fear Pollution, Complain of Noise, from Elon Musk's xAI Data-Center Turbines*, Miss. Today (Nov. 24, 2025), https://mississippitoday.org/2025/11/24/southaven-residents-fear-pollution-complain-of-noise-from-elon-musks-xai-data-center-turbines/.

live here like this for another nine months. It's going to drive me crazy."[58]

101. Mr. Haley filed noise complaints, spoke with the local police department, and emailed Mayor Musselwhite, to no avail.[59]

102. Mississippi Today reporters visiting Southaven on November 12, 2025 recorded a "constant loud humming noise easily heard from the homes in the Colonial Hills subdivision of Southaven."[60] These reporters reached out to xAI with questions about noise complaints and received what appeared to be an automated message that said, "Legacy Media Lies."[61]

103. In a November 19, 2025 email to Mississippi Today, Mayor Musselwhite claimed: "The noise is mostly temporary construction noise that will go away within days. xAI has assured the City that any and all necessary adjustments will be made within days to mitigate any noise and not negatively impact surrounding developments and neighborhoods in any way."[62] That turned out not to be true.

104. In December 2025, Defendants increased the number of turbines at the Southaven Plant from 18 to 27.[63]

105. At a December 16, 2025 meeting of the Mayor and Board of Aldermen of Southaven, Mayor Musselwhite gave another report regarding noise concerns, stating that "many citizens have reached out to him directly to express concerns with noise levels associated with

---

[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] Bracey Harris, *Elon Musk's Makeshift AI Power Plant Generates Sound and Fury in Mississippi*, NBC News (Feb. 26, 2026), https://www.nbcnews.com/news/us-news/musks-ai-power-plant-generates-sound-fury-mississippi-rcna258594.

the old power plant renovation that is now the new xAI development."[64] Whatever mitigation measures Defendants claim to have taken have not meaningfully reduced the noise emanating into the Southaven community.[65]

106. The noise and disruption persist, and Plaintiffs continue to experience the same daily disturbances in their lives.

107. And the noise and disruption will only increase as a result of the massive build-out of the gas turbine power plant. The below photo, contained in a CNBC article from July 16, 2026, shows the increased footprint of the gas turbine plant, and also plainly shows that construction is continuing.[66]

[64] Mins., Meeting of the Mayor and Bd. of Alderman, Southaven, Miss. at 19 (Dec. 16, 2025), https://southaven.org/ArchiveCenter/ViewFile/Item/1743.
[65] Bracey Harris, *Elon Musk's Makeshift AI plant generates sound and fury in Mississippi*, NBC News, (Feb. 26, 2026), https://www.nbcnews.com/news/us-news/musks-ai-power-plant-generates-sound-fury-mississippi-rcna258594.
[66] Kolodny, Laruen, and Pettitt, Jeniece, *Elon Musk's Memphis AI empire is the epicenter of the data center backlash* (July 16, 2026), https://www.cnbc.com/2026/07/16/elon-musk-memphis-ai-colossus-data-center.html.



*Figure 3*: aerial image of xAI's Stanton Road S. facility (July 16, 2026)

108. On or about December 23, 2025, MZX purchased the property at 2400 Stateline Road, Southaven, Mississippi, located approximately 1 mile from the Southaven Plant.[67] Shortly thereafter, xAI announced its plans to construct and operate a third large-scale data center, called MACROHARDRR, at this site.[68] This new, 810,000 square-foot data center will bring xAI's Memphis-area power demands to nearly 2 GW[69]—approximately the output of the Hoover Dam.

109. On July 29, 2026, an X user posted an image of the Colossus II and MACOHARDRR data centers. The user noted that "[t]o the right of the Megapacks you can see

[67] Katherine Lin, *Is Elon Musk's xAI Adding Another Data Center in DeSoto County?*, Miss. Today (Dec. 31, 2025), https://mississippitoday.org/2025/12/31/elon-musk-mississippi-datacenter-southaven-memphis/.

[68] *See* Elon Musk (@elonmusk), X (Dec. 30, 2025, at 4:00 ET), https://x.com/elonmusk/status/2006108047609930069; *Musk's xAI to Invest Over $20 Billion in Mississippi Data Center*, Reuters (Jan. 8, 2026), https://www.reuters.com/business/musks-xai-invest-over-20-billion-mississippi-data-center-2026-01-09/. The name is a dig at xAI's competitor, Microsoft.

[69] Andrew Bell, *As Musk's xAI Data Centers Encroach on Southaven, North Mississippi Residents Push Back*, Miss. Free Press (Feb. 17, 2026), https://www.mississippifreepress.org/as-musks-xai-data-centers-encroach-on-southaven-north-mississippi-residents-push-back/.

construction of the large warehouse continues. To the far right, along Tulane Rd, we can see the build site for what I thought was going to be an office building. Does not look like an office at this point."[70]

110. Elon Musk replied to the post, explaining that "[t]o the right is Minihard, which will have the same 220k GB300s with 800 gig NICs as Macroharder, but in an improved, much denser configuration[.]"[71]

111. Community members explained that "Memphis residents had no idea a 4th data center was coming to Whitehaven. Lack of transparency seems to be on brand for how this company operates and how city leadership consistently bends" to Defendants' pressure.[72]

112. To date, Defendants have purchased over 1,100 acres in the greater Memphis area for its data centers and power plant.[73]

113. xAI has yet to announce how it plans to power its MACROHARDRR plant.[74]

114. At the January 6, 2026 meeting of the Mayor and Board of Aldermen of Southaven, Mayor Musselwhite discussed xAI's purchase of 2400 Stateline Road, stating that this "new development is consistent with initial projected plans to step-up expansion across the

---

[70] *See* S.E. Robinson Jr. (@SERobinsonJR), X (Jul. 29, 2026, at 6:48 PM ET), https://x.com/SERobinsonJr/status/2082599182372839908?s=46.
[71] Elon Musk (@elonmusk), X (Jul. 29, 2026, at 7:44 PM ET), https://x.com/elonmusk/status/2082613281328660734?s=46.
[72] Martin Staunton, *Whitehaven blindsided by newly revealed xAI data center)*, Fox 13 (Jul. 30, 2026), https://www.fox13memphis.com/news/whitehaven-blindsided-by-newly-revealed-xai-data-center/article_b854f00b-d6b5-4feb-b2bf-88e2f9726d4d.html.
[73] Kolodny, Laruen, and Pettitt, Jeniece, *Elon Musk's Memphis AI empire is the epicenter of the data center backlash* (July 16, 2026), https://www.cnbc.com/2026/07/16/elon-musk-memphis-ai-colossus-data-center.html.
[74] Jason Ma, *xAI Plans Third Data Center*, Musk Claims Will Bring Capacity Up to Almost 2GW, Data Center Dynamics (Jan. 2, 2026), https://www.datacenterdynamics.com/en/news/xai-plans-third-data-center-musk-claims-will-bring-capacity-up-to-almost-2gw/.

Mississippi line making Southaven a key part of xAI operations[.]"[75]

115. At that meeting, residents once again voiced their concerns with the "high pitched noise and lack of air quality monitoring for temporary turbines" and the "lack of public information about impact of the project."[76] The residents also presented a petition with over 900 signatures, which raised, as one concern, the noise pollution from the Southaven Plant, and asked their local government to take action.[77]

116. Shortly thereafter, it was revealed that MZX made a $1.38 million donation to the Southaven Police Department—the same department residents had called, and would call in the future, to report noise disturbances caused by the Southaven Plant.[78]

117. At a January 20, 2026 meeting of the Mayor and Board of Aldermen, the Mayor asserted that he had been "in continual discussion with [xAI] about the City's noise ordinances" and once again promised that "the noise level has been reduced and Citizens will soon see the significant noise reduction."[79] Despite these assurances, there has been no significant reduction in the noise generated by Defendants' Facilities. In fact, the noise and daily disturbances to Plaintiffs' lives continue to increase.

118. The Mayor reported on January 20, 2026 that "meters will continue to be placed

---

[75] Mins., Meeting of the Mayor and Bd. of Alderman, Southaven, Miss. at 8 (Jan. 6, 2026), https://southaven.org/ArchiveCenter/ViewFile/Item/1749.
[76] *Id.*
[77] *Id.*; *see* Shayna Norwood, *Southaven Mayor Responds to Concerns over xAI Facility*, Action News 5 (Jan. 7, 2026), https://www.actionnews5.com/2026/01/07/southaven-mayor-responds-concerns-over-xai-facility/.
[78] *See* Mins., Meeting of the Mayor and Bd. of Alderman, Southaven, Miss. at 14 (Jan. 20, 2026), https://southaven.org/ArchiveCenter/ViewFile/Item/1754; Bracey Harris, *Elon Musk's Makeshift AI Power Plant Generates Sound and Fury in Mississippi*, NBC News (Feb. 26, 2026), https://www.nbcnews.com/news/us-news/musks-ai-power-plant-generates-sound-fury-mississippi-rcna258594.
[79] *Mins. (Jan. 20, 2026)* at 15.

at strategic locations to monitor to decimal [sic] recordings and that information will be provided to Citizens on a routine basis."[80]

119. As of the filing of this complaint, more than eight months later, residents have yet to receive an update regarding the decibel readings from those monitors.

120. However, residents' noise measurements have captured decibel levels as high as 70 dBA at residents' property lines, in violation of Memphis's noise ordinance.

121. On January 20, 2026, the same day as the meeting of the Mayor and Board of Aldermen, news broke that Defendants had submitted a permit application to the MDEQ, seeking permission to install 41 permanent gas-powered turbines at the Southaven Plant that would generate approximately 1.2 gigawatts of electricity[81]—three times the 400 MW output the temporary generators then present were capable of reaching.[82]

122. By February 2026, there were at least 27 "temporary" turbines at the Southaven Plant.

---

[80] *Id.*

[81] Katie Copeland & Brayel Brown, *xAI Seeking Permit for 41 Gas Turbines in Southaven*, News Channel 3 (Jan. 20, 2026), https://wreg.com/news/local/xai-seeking-permit-for-41-gas-turbines-in-southaven/.

[82] Alex Rozier and Katherine Lin, *Southaven residents fear pollution, complain of noise, from Elon Musk's xAI data-center turbines*, Miss. Today (Nov. 24, 2025), https://mississippitoday.org/2025/11/24/southaven-residents-fear-pollution-complain-of-noise-from-elon-musks-xai-data-center-turbines/.



*Figure 4*. Close-up aerial image of xAI's Stanton Road S. facility showing 27 turbines (Feb. 9, 2026).

123. On February 17, 2026, MDEQ held a public hearing on Defendants' permit application for the 41 permanent gas-powered turbines. The room was full of hundreds of attendees, most of them residents who live near the Southaven Plant. While Tennessee residents are significantly impacted by the operation of turbines at the Southaven Plant, they have no say in Mississippi's permitting process.[83]

124. No members of the MDEQ permit board (the group responsible for considering and ruling on the permit application) attended the hearing.[84]

125. Thirty audience members voiced concerns over the turbines' potential pollution.[85]

126. Many Southaven residents raised concerns about the ongoing noise emitted by the

---

[83] *Groups appeal air permits for xAI's personal power plant in North Mississippi*, Southern Environmental Law Center (Apr. 9, 2026), https://www.selc.org/press-release/groups-appeal-air-permit-for-xais-personal-power-plant-in-north-mississippi/.

[84] Gamer Montgomery, *Residents Oppose xAI Southaven Turbines Permit at MDEQ Hearing*, Action News 5 (Feb. 17, 2026), https://www.actionnews5.com/2026/02/18/residents-oppose-xai-southaven-turbines-permit-mdeq-hearing/.

[85] Alex Rozier, *Public Gives Resounding 'No' to Proposed xAI Southaven Permit*, Miss. Today (Feb. 18, 2026), https://mississippitoday.org/2026/02/18/xai-southaven-permit-public-resounding-no/.

Southaven Plant, describing it as a constant roar.[86]

127. Mr. Haley told MDEQ, "This is heard at night when I'm trying to go to sleep, and I hear it when I wake up. This caused loss of sleep. I have headaches. My ears now ring[.]"[87]

128. Devan Jenkins, whose family has lived in a nearby neighborhood for five generations, described it as a "deep, constant drone that vibrates in your house."[88]

129. Angie Davis described the sound near her daughter's Colonial Hills home like that of a jet engine.[89]

130. Reverend Robert James, President of the Mississippi Conference for the NAACP emphasized that "[w]ith this new permit[,] noise and air pollution will increase, intensify existing health risks and prolonging injustice for those who have opposed xAI for over a year."[90]

131. Resident Taylor Logsdon spoke at the meeting and echoed a sentiment shared among the community: "Since August, we have slowly fallen out of love with where we decided to grow our family."[91]

---

[86] *Id.*; Gamer Montgomery, *Residents Oppose xAI Southaven Turbines Permit at MDEQ Hearing*, Action News 5 (Feb. 17, 2026), https://www.actionnews5.com/2026/02/18/residents-oppose-xai-southaven-turbines-permit-mdeq-hearing/.
[87] Gamer Montgomery, *Residents Oppose xAI Southaven Turbines Permit at MDEQ Hearing*, Action News 5 (Feb. 17, 2026), https://www.actionnews5.com/2026/02/18/residents-oppose-xai-southaven-turbines-permit-mdeq-hearing/.
[88] Alex Rozier, *Public Gives Resounding 'No' to Proposed xAI Southaven Permit*, Miss. Today (Feb. 18, 2026), https://mississippitoday.org/2026/02/18/xai-southaven-permit-public-resounding-no/.
[89] Neil Strebig & Jacob Wilt, *Crowd Pushes Back Against xAI Turbines in Southaven During Hearing*, Com. Appeal (Feb. 17, 2026), https://www.commercialappeal.com/story/money/business/development/2026/02/17/xai-in-southaven-turbines-permit/88402053007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=zl15244pl173501116450cl17350e000100vll5244d--38--b--38--&gca-ft=l73&gca-ds=sophi.
[90] Mike Suriani, *Hundreds Pack Southaven Hearing on xAI Concerns*, News Channel 3 (Feb. 17, 2026), https://wreg.com/news/local/xai-memphis/resident-attend-southaven-public-hearing-on-xai-gas-turbine-permit/.
[91] *Id.*

132. Not one person spoke in favor of the permit application. Neither Defendants nor officials from the City of Southaven responded to residents' concerns about the ongoing noise. They did not speak at all during the hearing.[92]

133. Written comments submitted to MDEQ by local area residents (including residents of Southaven) regarding Defendants' permit application similarly expressed significant concerns about the noise created by the existing "temporary" turbines, and fears that the proposed "permanent" turbines would perpetuate these ongoing harms. Despite the unanimous condemnation of the permit application at this hearing, and the consistent outcry against the Southaven Plant from Southaven residents, on March 10, 2026, the MDEQ permit board approved Defendants' application for a permit for the 41 new "permanent" turbines at the Southaven Plant.[93]

134. Defendants have provided no assurance that the "permanent" turbines will meaningfully reduce the noise emitted from the facility.

135. Defendants' permit for the "permanent" turbines now faces legal challenges.[94]

136. In the face of that legal challenge, in May 2026, Defendants increased the number of "temporary" gas turbines at the Southaven Plant to 57.[95]

---

[92] Alex Rozier, *Southaven Residents Oppose xAI Air Permit for 41 Natural Gas Turbines at Public Hearing*, Tri-State Defender (Feb. 21, 2026), https://tri-statedefender.com/southaven-residents-oppose-xai-air-permit-for-41-natural-gas-turbines-at-public-hearing/02/21/.

[93] Alex Rozier, *State Board Approves xAI Permit, Southaven Community Left With "Dread,"* Miss. Today (Mar. 10, 2026), https://mississippitoday.org/2026/03/10/xai-permit-approved-southaven/.

[94] Press Release, S. Env't L. Ctr., *Groups Appeal Air Permit for xAI's Personal Power Plant in North Mississippi* (Apr. 9, 2026), https://www.selc.org/press-release/groups-appeal-air-permit-for-xais-personal-power-plant-in-north-mississippi/.

[95] Alex Rozier, *xAI Now Has 46 Gas Turbines Without Air Permits. State officials Are "Evaluating the Situation,"* Miss. Today (May 11, 2026), https://mississippitoday.org /2026/05/11/xai-46-gas-turbines-no-air-permits/; E-mail from Shannon Lynn, Trinity

137. While a spokesperson for MDEQ claimed the agency is "evaluating the situation and will make the facility aware as to when it can no longer bring additional portable/temporary turbines on-site," MDEQ has also indicated that xAI is not required to tell the agency when it brings on additional generators.[96]

138. At a May 19, 2026 meeting of the Mayor and the Board of Alderman of Southaven, Mayor Musselwhite finally acknowledged the ongoing harm publicly, stating that he talks to someone "every night" about the noise from the Southaven Plant, that "[t]he noise has not been acceptable," and even stating: "I hear the citizens. I agree with them." The Mayor revealed that he had asked Defendants about the noise the operation would create before they began operating in Southaven, and he was misled by Defendants to believe the noise would not be a problem. He further noted that "because it is a continuous noise, a low frequency continuous hum, we've asked [Defendants] to do extra things. Even EPA has acknowledged that low frequency continuous noise needs to be kept at a lower level."[97] In short, he indicated that "[i]t is a problem."[98]

139. But Defendants still have not reduced the noise.

140. Indeed, the noise will only increase as the project's footprint continues to expand, including the installation of the 41 permanent turbines, the construction and operation of the

---

Consultants, to Jaricus Whitlock, Air Div., Miss. Dep't of Env. Quality (May 15, 2026, at 5:03 ET) (available at https://drive.google.com/file/d/1B8subqdj7KieLgeobLFrOylgFxP1F5qy/view).

[96] Alex Rozier, *xAI Now Has 46 Gas Turbines Without Air Permits. State officials Are "Evaluating the Situation,"* Miss. Today (May 11, 2026), https://mississippitoday.org /2026/05/11/xai-46-gas-turbines-no-air-permits/.

[97] CITY OF SOUTHAVEN BOARD MEETING, *Meeting of the Southaven, Mississippi Mayor and Board of Aldermen - May 19, 2026* (YouTube, May 19, 2026), https://www.youtube.com /live/xsEH7ueaneY?t=l894s

[98] Laura Fichten, *Mississippi homeowners blame a noisy data center plant for sleepless nights. The mayor's advice? "Consider Selling."* CBS News (July 16, 2026), https://www.cbsnews.com/news/mississippi-elon-musk-xai-data-center-power-plant-noise/.

MACROHARDRR and Minihard data centers—which Defendants have not yet disclosed how they plan to power—and the continued construction and operation of additional supporting facilities, such as xAI's planned "water recycling facility," which the company intends to use "once the data center is up to scale."[99] The ever-expanding construction projects will also continue to produce dust and ash that intrudes into community members' outdoor spaces and homes.

**VIII. <u>Residents' concerns about the noise are well-founded: noise exposure is known to impair mental and physical health and wellness.</u>**

141. As of the filing of this complaint, the "temporary" turbines continue to operate at the Southaven Plant, blasting noise into the surrounding area all day, every day.

142. The noise from the "temporary" turbines continues to permeate neighborhoods and enter residents' properties, affecting daily activities, interfering with residents' ability to use and enjoy their homes, and diminishing property values.

143. The near-constant noise includes broadband sound and low frequencies, both of which exceed typical suburban background sound levels, and associated vibration. The noise routinely emitted by the Facilities is not only intolerable for residents, but it also regularly exceeds 70dBA.

144. The noise emanating from Defendants' Facilities, which vastly exceeds typical suburban background noise, can be heard throughout the Class Area defined below.

145. The noise that residents hear every day does not represent the full extent of the noise exposure that residents face. Even when not consciously audible to the human ear, low frequency noise (including infrasound) and tonal noise components can be perceived physically

---

[99] Andrew Bell, *As Musk's xAI Data Centers Encroach on Southaven, North Mississippi Residents Push Back*, Miss. Free Press (Feb. 17, 2026), https://www.mississippifreepress.org/as-musks-xai-data-centers-encroach-on-southaven-north-mississippi-residents-push-back/.

and psychologically and therefore still impact residents.

146. Most noise measurements are conducted using an A-weighted decibel scale (dBA). However, the dBA scale only captures sounds that are audible to human ears and filters out low frequency noise.

147. If the noise from Defendants' Facilities were measured using a dBC scale—which encompasses a decibel range more attuned to industrial noise—the decibel readings would likely be significantly higher.

148. As explained by Devan Jenkins, who lives in Memphis' Whitehaven neighborhood and can hear the noise from Defendants' Facilities: "You can feel it rattling your eardrums ... It makes you feel like you're going insane."[100]And for property owners, the ongoing and constant noise and associated vibration diminishes their property value. This loss in property value arises both from the nuisance itself as well as the stigma of living near a facility that emits such noise, both of which make it harder to sell a home. As one Southaven resident has put it: "Hell, I couldn't give my house away with all this noise."[101]

149. Residents' concerns and anxiety about their exposure to constant noise, which prevents them from using their outdoor spaces and enjoying the comforts of their homes, are well-founded.

150. Sound affects the body. This fact is widely understood and employed in various fields: from the soothing tones played at a spa to encourage relaxation, to the low-frequency

---

[100] Illan Ireland, *"We Are Not Expendable": Southaven Residents Fight xAis Plan for 41 Gas Turbines to Power Musks Grok*, Miss. Free Press (Mar. 6, 2026), https://www.mississippifreepress.org/xai-faces-fierce-opposition-over-southaven-mississippi-power-plant-permit/.

[101] Bracey Harris, *Elon Musk's Makeshift AI Power Plant Generates Sound and Fury in Mississippi*, NBC News (Feb. 26, 2026), https://www.nbcnews.com/news/us-news/musks-ai-power-plant-generates-sound-fury-mississippi-rcna258594.

infrasound woven into the soundtrack of horror movies to instill fear, tension and stress in the audience.

151. Noise is defined as any sound that is unwanted.[102] This can mean, among other things, sound that is too loud, sound that lasts too long, or sound that is disturbing. There are three basic dimensions of sound, each of which can contribute to the perception of noise: magnitude (i.e., volume), frequency (i.e., pitch), and time (i.e., duration and variation).[103]

152. Thus, a sound may not be disturbing if heard only for a short time, but when experienced constantly, it can become a significantly disturbing noise. The circumstances in which sound is heard also contribute to the experience of it. For example, while high volume music with resonant bass may be an enjoyable sound for an hour at a concert, it is a disturbing noise when you are trying to sleep.

153. Noise disturbance can also be amplified depending on the volume and pitch of the sound. For example, noise with tonal components—whistles, whines, or hums—is often perceived as more annoying than broadband noise because the human ear is more sensitive to pure tones.[104]

154. Persistent exposure to elevated noise levels—even when those levels are not particularly high in A-weighted decibel (dBA) terms—has been demonstrated in peer-reviewed literature to cause a variety of auditory and non-auditory health harms.

155. Long-term or repeated exposure to elevated noise can cause hearing impairment,

---

[102] *What is Noise*, Inst. of Noise Control Eng'g, https://www.inceusa.org/about-ince-usa/what-is-noise/ (last visited June 2, 2026).
[103] *Id.*
[104] *What Is Tonal Noise and Why Is It Considered More Annoying than Broadband Noise?*, Sustainability Directory (Nov. 26, 2025), https://pollution.sustainability-directory.com/learn/what-is-tonal-noise-and-why-is-it-considered-more-annoying-than-broadband-noise/.

hearing loss, or tinnitus. The louder the sound, the less time it takes to damage hearing.[105]

156. Exposure to persistent lower-level noise, particularly with low-frequency or tonal components, can lead to increased annoyance, irritability, stress, reduced sleep quality, and secondary psychological harms such as anxiety or depression.[106]

157. Peer-reviewed medical literature also shows that persistent noise exposure contributes to non-auditory health harms including stress hormone dysregulation, impaired cognitive performance, and cardiovascular disease.[107]

158. Chronic noise exposure activates the body's stress response (including the hypothalamic-pituitary-adrenal axis and the sympathetic nervous system), leading to elevated stress hormones, oxidative stress, endothelial dysfunction, elevated blood pressure and other cardiovascular effects—even in individuals who do not subjectively perceive the noise as "loud."[108]

159. Epidemiological studies show that environmental noise exposure is associated

---

[105] *See Noise-Induced Hearing Loss*, Nat'l Inst. on Deafness and Other Commc'n Disorders, https://www.nidcd.nih.gov/health/noise-induced-hearing-loss (last visited June 2, 2026); Tang-Chuan Wang et al., *Noise Induced Hearing Loss and Tinnitus—New Research Developments and Remaining Gaps in Disease Assessment, Treatment, and Prevention*, Brain Sciences, Oct. 2020, at 7, http://pmc.ncbi.nlm.nih.gov/articles/PMC7602100/.

[106] *See, e.g.*, Omar Hahad et al., *Environmental Noise-Induced Effects on Stress Hormones, Oxidative Stress, and Vascular Dysfunction: Key Factors in the Relationship between Cerebrocardiovascular and Psychological Disorders*, Oxidative Medicine and Cellular Longevity, Nov. 11, 2019, at 1-2, https://pmc.ncbi.nlm.nih.gov/articles/PMC6878772/.

[107] *See, e.g.*, Jennifer Biddle, *How Noise Pollution Quietly Affects Your Health*, UC Davis Ctr. For Occupational & Env't Health (June 2, 2025), https://coeh.ucdavis.edu/research/how-noise-pollution-quietly-affects-your-health; Stephanie Dutchen, *Noise Pollution Is More Than a Nuisance. Its a Health Risk*, Harvard Medicine (2022), https://magazine.hms.harvard.edu /articles/noise-and-health.

[108] *See* Ane Arregi et al., *Road Traffic Noise Exposure and Its Impact on Health*, Env't Sci. & Pollution Rsch., July 8, 2024, at 1, https://pmc.ncbi.nlm.nih.gov/articles/PMC11297122/.

with elevated risks of hypertension, ischemic heart disease, atrial fibrillation, and stroke.[109]

160. Moreover, what is reasonable and/or safe during the day is different from what is reasonable at night. The World Health Organization (WHO) recommends that average night noise exposure should not exceed 40 decibels (dB) to prevent adverse physical and mental health effects from sleep disturbance.[110]

## IX. Each Plaintiff has been harmed by the noise emanating from Defendants' Facilities.

161. Plaintiff Robert Carter's owns a home located approximately 1.5 miles from the Southaven Plant and 1.25 miles from the Colossus II data center in the Class Area (defined below).

162. Prior to the construction of Defendants' Facilities, Mr. Carter enjoyed the peace and quiet that was characteristic of his neighborhood.

163. Due to the construction and operation of Defendants' Facilities, Mr. Carter is subject to persistent, loud hum that sounds like an engine running constantly. Mr. Carter lives with this noise 24 hours per day, 7 days per week.

164. The nonstop, aggravating noise unreasonably interferes with Mr. Carter's ability to use and enjoy his home and has diminished the value of his property. Mr. Carter has started to take sleeping medication to help him sleep through the constant noise.

165. Mr. Carter has also experienced poor air quality due to the operations at Defendants' Facilities, including constant dust in the air and a distinctive odor.

166. Moreover, Defendants' actions have caused substantial amounts of dust and ash to

---

[109] Samira Tabei et al., *The Relationship Between Noise Pollution and Cardiovascular Diseases: An Umbrella Review on Meta-Analyses*, BMC Cardiovascular Disorders, August 26, 2025, at 1, https://link.springer.com/article/10.1186/s 12872-025-04864-9.
[110] *What Is the Recommended Decibel Level for Residential Areas at Night?*, Sustainability Directory (Nov. 24, 2025), https://pollution.sustainability-directory.com/learn/what-is-the-recommended-decibel-level-for-residential-areas-at-night/.

emanate from their Facilities and to cross onto his property, settling and remaining on vehicles and outdoor furniture. The dust and ash also come indoors when doors and windows open and close. As a result, the dust and ash have substantially interfered with Mr. Carter's ability to use and enjoy his home, including its outdoor spaces.

167. Plaintiff Sabrina Anderson owns or rents a home located approximately 1.8 miles from the Southaven Plant and 1.3 miles from the Colossus II data center in the Tennessee Class Area (defined below).

168. Prior to the construction of Defendants' Facilities, Ms. Anderson enjoyed the peace and quiet that was characteristic of her neighborhood in Memphis, Tennessee.

169. Due to the construction and operation of Defendants' Facilities, Ms. Anderson is subject to persistent, loud noise throughout the day and night.

170. The aggravating noise unreasonably interferes with Ms. Anderson's ability to use and enjoy her home and has diminished her property value. The noise has exacerbated Ms. Anderson's anxiety, and makes it difficult for her and her husband to sleep through the night.

171. Moreover, Defendants' actions have caused substantial amounts of dust, ash, and other particles to emanate from their Facilities and to cross onto her property, settling and remaining on vehicles and outdoor furniture. The dust and ash also come indoors when doors and windows open and close. As a result, the dust and ash have substantially interfered with Ms. Anderson's ability to use and enjoy her home, including its outdoor spaces.

172. Members of the proposed Class have exhausted every reasonable avenue available to them to obtain relief from Defendants' unlawful conduct. They have contacted Defendants' representatives about the noise, repeatedly reported the noise to code enforcement officials and local law enforcement, raised their concerns with their mayor, organized and submitted

comments opposing Defendants' expansion efforts and permit applications, challenged governmental approvals, and brought widespread public attention to the issue through local and national media coverage. Despite these sustained efforts, the Facilities' noise continues to invade their homes, disrupt their daily lives, and diminish their quality of life. Having been unable to secure relief through any other means, Plaintiffs now seek the intervention of this Court.

## CLASS ACTION ALLEGATIONS

173. Plaintiffs incorporate the foregoing paragraphs.

174. Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed class pursuant to Federal Rules of Civil Procedure 23(a), (b)(l)(A), (b)(2), (b)(3), and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

175. Plaintiffs bring this action and seek to certify and maintain it as a class action on behalf of themselves and the state-wide Tennessee class ("the Class") defined below.

### I. The proposed Class meets the requirements for class certification.

176. The Class is initially defined as follows:

> All individuals who resided at any time between August 2025 and the present within the area in Tennessee bounded by Winchester Road to the North; Airway Boulevard to the East; Solitaire Way to the West; and the Tennessee/Mississippi border to the South.

177. Upon information and belief, the persistent and disturbing noise from the Defendants' Facilities, as described in this Complaint, can be heard throughout the area described above (the "Class Area").

178. Thousands of residences are located within the Class Area and, upon information and belief, more than 10,000 class members reside within the Class Area.

179. Excluded from the class set forth above are: (a) Defendants, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (b) the Judge, Magistrate Judge, and other judicial officers to whom this case is assigned, and their immediate family members; and (d) the legal representatives, successors, and assigns of any such excluded persons.

180. Plaintiffs reserve the right to amend the class definition set forth above if discovery and/or further investigation reveals that any class should be expanded, divided into subclasses, or modified in any way.

181. Plaintiffs are not seeking recovery here for personal injuries.

182. This action should be maintained as a class action under Rule 23(a) as it satisfies the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

183. <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are thousands of individuals in the Class as described above.

184. <u>Commonality</u>: The questions of law and fact common to the Class Members, which predominate over any questions which may affect individual Class Members include, but are not limited to:

1) Whether Defendants have operated and continue to operate the Facilities in a manner causing substantial, unreasonable, and continuing interference with the Class Members' right of use and enjoyment of their property;

2) Whether Defendants' conduct has unreasonably interfered with rights common to the general public;

3) Whether Defendants were negligent in the design, construction, and operation of the Facilities;

4) Whether Defendants owed any duties to Class Members;

5) Whether Defendants breached one or more duties to Class Members;

6) Whether Defendants' conduct constitutes a nuisance under Tennessee law;

7) Whether Defendants' conduct was a substantial factor in causing harm to Class Members;

8) Whether Defendants violated any Tennessee laws or local ordinance, including Memphis Code of Ordinances Section 9-68-1;

9) Whether Defendants knew or should have known of the risk of harm to Class Members caused by their conduct;

10) Whether Defendants knew or should have known that their conduct was causing harm to Class Members;

11) What is the proper measure of damages incurred by, abatement required to address the nuisance suffered by, and injunctive relief available to, the Class Members.

185. Typicality: The Plaintiffs are members of the proposed Class. The Plaintiffs' claims are typical of the claims of each Class Member. The Plaintiffs are entitled to relief under the same causes of action as the other Class Members.

186. Adequacy: The Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the Class Members they seek to represent, they have a strong interest in vindicating their rights and the rights of the Class, they have retained counsel competent and experienced in complex class action litigation, and counsel intends to vigorously

prosecute this action and has the financial resources to do so. Neither the Plaintiffs nor their counsel have interests adverse to the classes.

187. Predominance: Pursuant to Rule 23(b)(3), the common issues of law and fact identified above predominate over any other questions that may affect only individual members of the Class. The facts and the legal theories regarding Defendants' wrongful conduct are substantially the same for the Plaintiffs and all of the Class members, and the action is also amenable to a class-wide calculation of damages through expert testimony.

188. Superiority: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

1) The joinder of hundreds or thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

2) The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claims, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions;

3) When Defendants' liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

4) This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

5) Plaintiffs know of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action;

6) This class action will assure uniformity of decisions among Class Members;

7) The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

8) The Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action; and

9) It would be desirable to concentrate in this single venue the litigation of all Class Members who were harmed by Defendants' conduct.

189. Accordingly, this action is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to the Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

190. In addition to the above, Plaintiffs bring an action under Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the class, such that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole. Such injunctive relief includes, but is not limited to, an injunction limiting or preventing Defendants from engaging in the ongoing harmful practices through its operations detailed herein.

191. The Plaintiffs and the Class also seek a declaration that Defendants acted with

negligence, gross negligence, and/or willful, wanton, and careless disregard for the health and wellness of the Plaintiffs and members of the Class.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### PRIVATE NUISANCE

192. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

193. Plaintiffs bring this claim on behalf of themselves and the Class under Tennessee law. Plaintiffs and Class Members all resided in and/or owned residential property located near Defendants' Facilities.

194. Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have operated and continue to operate the Facilities in a manner causing substantial, unreasonable, and continuing interference with each Plaintiff's and each Class Member's private right of use and enjoyment of their property.

195. Due to Defendants' operation of the Facilities, Plaintiffs and Class Members have been and are exposed to constant loud, persistent, and low-frequency noise and vibrations emanating from Defendants gas-powered turbines and data centers.

196. This noise and associated vibration reaches into Plaintiffs' and Class Members' homes at all hours, rendering their ordinary use and physical occupation uncomfortable.

197. Plaintiffs and Class Members are no longer able to spend time in their outdoor living spaces or enjoy the fundamental ability to relax and sleep in the comfort of their own homes at night due to the inescapable sound and vibration that penetrate their walls. The intensity, duration, and character of these noises are such that a reasonable person of ordinary sensibilities residing in the community would consider them an excessive and unreasonable

disturbance.

198. Plaintiffs and Class Members experience well-founded concerns, distress, and anxieties about the negative impact of persistent noise exposure and resulting sleep deprivation on their mental and physical health, as well as that of their children and family members. These concerns prevent Plaintiffs and Class Members from using and enjoying their properties as they otherwise would, including spending time in outdoor spaces.

199. Plaintiffs and Class Members when using and enjoying their properties experience nuisance-level physical impacts from their persistent noise exposure, including, but not limited to, headaches, nausea, and tinnitus.

200. Plaintiffs and Class Members cannot seek reprieve from such exposures by retreating to their homes. Defendants' noise is omnipresent and inescapable, penetrating the walls of Plaintiffs' and Class Members' homes even during the night, and shattering the peace and quiet previously present in Plaintiffs' and Class Members' lives.

201. Defendants knew or should have known that the facility's design and 24-hour operations would emit a continuous industrial noise incompatible with adjacent residential neighborhoods.

202. Despite repeated complaints from Plaintiffs and Class Members, and express admonition by city officials, Defendants have not adopted adequate noise-control measures.

203. As a direct and proximate result of Defendants acts and omissions, Plaintiffs and Class Members have suffered and will continue to suffer loss of enjoyment and use of their properties and diminution in property value. Defendants' conduct has violated each Plaintiff's and Class Member's private right to the use and enjoyment of their real property.

204. The nuisance is ongoing and unabated, and causes new and ongoing injury each

day that the Facilities operate.

205. Accordingly, Plaintiffs seek damages for the loss of the use and enjoyment of their real properties and the diminution of the values of their properties, as applicable, and abatement and injunctive relief as described herein.

## SECOND CAUSE OF ACTION
## PUBLIC NUISANCE

206. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

207. Plaintiffs bring this claim on behalf of themselves and the Class under Tennessee law.

208. Under Memphis, Tennessee Code of Ordinances Section 9-68-1, "[t]he creating of any unreasonably loud, disturbing and unnecessary noise within the limits of the city is prohibited. Any noise of such character, intensity or duration as to be detrimental to the life or health of any individual, or in disturbance of the public peace and welfare is prohibited."

209. Defendants' conduct constitutes a public nuisance because it unreasonably interferes with rights common to the general public, including the right to health, safety, and peace.

210. Defendants' operations have materially and significantly impaired the public's right to peaceful and quiet enjoyment of their environment and have endangered public health and welfare by creating an environment that is plagued by excessive and offensive noise. These impairments are continuing.

211. The continuous and excessive noise and vibration emitted from the facility have affected the public rights of a substantial number of residents in the surrounding neighborhood.

212. The Class is located within the municipality of Memphis, Tennessee.

213. Plaintiffs and Class Members have suffered and continue to suffer special injury and irreparable harm distinct from that of the public at large due to their close proximity to the Facilities.

214. As a result of their proximity to Defendants' Facilities, the continuous, excessive noise and vibrations emanating from the Facilities have caused and continue to cause Plaintiffs and Class Members to suffer from anxiety, increased stress, loss of sleep, headaches, and other nuisance-level physical health effects. Such harms to their ability to use and enjoy their properties constitutes an injury different in kind and not merely in degree from the generalized unreasonable interference with public rights experienced by the broader community, and is irreparable. Indeed, the harms to Class Members continue to grow as Defendants continue to build out their Facilities.

215. Additionally, Plaintiffs and Class Members who own residential property in the Class Area have experienced diminution of property value due to the proximity of their homes to Defendants' operation. While a substantial number of individuals have been adversely affected by Defendants' conduct, Plaintiffs' and Class Members' injuries are unique in that Defendants' violations of public rights have directly and measurably reduced the market value of Plaintiffs' and Class Members' properties.

216. Defendants have failed to abate the nuisance despite knowledge of the harms caused and repeated notice from residents and city officials.

217. Plaintiffs therefore request abatement and injunctive relief requiring Defendants to abate the nuisance, including preventing Defendants from engaging in the ongoing harmful practices through its operations detailed herein, and damages for the harms caused by Defendants misconduct as described above, including diminution in value damages and loss of use damages.

**THIRD CAUSE OF ACTION**
**NEGLIGENCE**

218. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if set forth at length herein.

219. Plaintiffs bring this claim on behalf of themselves and the Class under Tennessee law.

220. Defendants knew or reasonably should have known that their continuous operations of data centers and gas-powered turbines at the Facilities would emit persistent and disturbing noise and vibrations into the surrounding neighborhood, including Plaintiffs' and Class Members' homes. Defendants further knew or reasonably should have known that chronic exposure to such noise and vibration is a recognized hazard to human health and the environment, preventing community residents from using their outdoor spaces due to concerns about health hazards, and from enjoying the comfort of their own homes due to stress, anxiety, irritability, and sleep deprivation.

221. Defendants further knew or reasonably should have known that it was unreasonable to locate and operate such Facilities at all hours in predominantly residential areas without implementing robust noise—and vibration—abatement measures.

222. Defendants further knew or reasonably should have known that their operations in fact caused and continue to cause serious disturbance in the community, and violated and continue to violate Memphis's local noise ordinance.

223. Defendants further knew or reasonably should have known that their operations were likely to significantly interfere with the use and enjoyment of Plaintiffs' and Class Members' property, including by causing harm to their physical and psychological health, and cause diminution of their property values.

224. Defendants owed, and continue to owe, Plaintiffs and Class Members a duty to exercise ordinary and reasonable care in the design, construction, and operation of the Facilities, so as not to inflict the foreseeable harms described above on neighboring residents.

225. Defendants breached and continue to breach their duty of ordinary and reasonable care by, among other ways:

1) Locating the Facilities in suburban residential areas, in close proximity to residences, knowing that they planned to continuously run gas-powered turbines and data centers that would send noise and vibrations into local residential areas at all hours of the day and night;

2) Failing to implement effective noise-control or vibration-mitigation measures, despite repeated complaints from community members and notice from public officials;

3) Operating the Facilities continuously around the clock in close proximity to residential properties in a manner that Defendants knew or should have known would interfere with residents' use and enjoyment of their properties by disrupting residents' sleep, impairing their wellbeing, degrading the surrounding environment, and diminish property values;

4) Misrepresenting to the community that any noise emanating from the Facilities would be mitigated and would not cause disturbance;

5) Continuing normal operations despite documented and reported community harm, ordinance violations, and knowledge of those conditions; and

6) Increasing the number of gas-powered turbines in operation at the Southaven Plant despite documented and reported community harm, ordinance violations, and knowledge of those conditions.

226. Defendants' breaches of duty were and are factual and proximate causes of Plaintiffs' and Class Members' injuries, which include, but are not limited to, lost use and enjoyment of property, such as inability to enjoy their outdoor living spaces, and diminution in property value.

227. Defendants have failed to reduce the intensity or duration of the constant noise emitted by the Facilities despite knowledge of the harms caused and repeated notice from residents and city officials.

228. Plaintiffs therefore request injunctive relief limiting or preventing Defendants from engaging in the ongoing harmful practices through its operations detailed herein and monetary damages for the harms caused by Defendants' misconduct, including loss of use damages and diminution in value damages.

## FOURTH CAUSE OF ACTION
## NEGLIGENCE PER SE

229. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

230. Plaintiffs bring this claim on behalf of themselves and the Class under the Memphis, Tennessee Code of Ordinances.

231. Section 9-68-1 of the Memphis Code of Ordinances provides that "[t]he creating of any unreasonably loud, disturbing and unnecessary noise within the limits of the city is prohibited. Any noise of such character, intensity or duration as to be detrimental to the life or health of any individual, or in disturbance of the public peace and welfare is prohibited."

232. Defendants' Facilities are located less than one-half mile from residential communities where people sleep, in populous suburban neighborhoods. The noise can be heard, and often felt, all day and all night long, with no reprieve. It consists of both broadband sound and tonal and low-frequency components, all of which are characteristic of industrial noise.

233. Plaintiffs and Class Members are no longer able to spend time in their yards or on their decks; no longer able to open their windows and doors to get fresh air or cool their homes; no longer able to relax inside of their homes because the sound and vibrations penetrate the walls; and no longer able to sleep well due to the inescapable disruption of the noise. The noise from Defendants' operations has and continues to annoy, disturb, and distress Plaintiffs and Class Members; and, for property owners, diminishes their property value.

234. The Memphis Code prohibits the creation of unreasonable noise for the benefit of its residential communities, including Whitehaven.

235. Plaintiffs and Class Members are within the class of persons the ordinance was enacted to protect: local residents whose health, safety, comfort, welfare and peace depend on the control of unreasonable noise.

236. The injuries Plaintiffs and Class Members have suffered and continue to suffer, including loss of sleep and other interferences with the use and enjoyment of property are precisely the types of harm the Memphis Code seeks to prevent.

237. Defendants' violations of the Memphis Code through the emission of noise that is so intense and continuous as to be detrimental to the health of residents, and disturbing to the public peace and welfare constitutes negligence per se, establishing breach of duty as a matter of law.

238. Defendants' violations directly and proximately caused and continue to cause

Plaintiffs' and Class Members' injuries and damages as described herein.

**FIFTH CAUSE OF ACTION**
**TRESPASS**

239. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

240. Plaintiffs bring this claim on behalf of themselves and the Class under Tennessee law.

241. Defendants' conduct and the resulting events described in detail in this Complaint amounted to an intentional intrusion on Plaintiffs' and Class members' properties.

242. Defendants intruded on the property of Plaintiffs and Class members without privilege, permission, invitation, or justification.

243. Defendants' intrusion onto the Plaintiffs' and Class members' properties interfered with their right of exclusive possession of their properties and their use and enjoyment of their properties.

244. The entry or intrusion onto Plaintiffs' and Class members' properties interfered with and continues to interfere with their exclusive possession and/or control of their property and caused, and continues to cause, actual and substantial harm to Plaintiffs' and Class members' properties.

245. Defendants have failed to abate this trespass onto Plaintiffs' and Class Members' properties despite knowledge of the harms caused and repeated notice from residents and city officials.

246. Plaintiffs therefore request injunctive relief to abate Defendants' trespass resulting from the ongoing harmful practices through its operations detailed herein.

247. As a direct and proximate result of Defendants' trespass, Plaintiffs and Class

members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate and/or the rental value, and loss of enjoyment of real property.

248. Defendants' wanton or reckless conduct, as described herein, entitles Plaintiffs and Class members to punitive damages.

## RELIEF SOUGHT BY THE CLASS

249. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

250. Plaintiffs and Class Members have sustained, and will continue to suffer, a loss of use and enjoyment of their properties and diminution in value of their properties as a result of Defendants' actions, as well as trespass and nuisance-level harms. As a result, Plaintiffs and Class Members seek monetary damages for each violation of their Claims for Relief. In particular, Plaintiffs and Class Members seek monetary damages to compensate them for, inter alia, interference with, and loss of, the use and enjoyment of their properties, trespass on their properties, nuisance-level harms, and violation of their private and public rights caused by Defendants' operations. Plaintiffs and Class Members who own their properties further seek damages to compensate for diminution in value of their property caused by Defendants' conduct, including the stigma tainting their neighborhood due to Defendants' operations therein.

251. In addition to the above, Plaintiffs and the Class seek abatement sufficient to address the harms created by the nuisance that Defendants caused or were a substantial factor in bringing about.

252. Further, because Defendants acts were done maliciously, oppressively, deliberately, and in reckless disregard of Plaintiffs and the class, Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to punish and deter such conduct in

the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a) Certify the Class, appoint Plaintiffs as Class Representatives and the undersigned as Class counsel;

b) Enter a judgment in favor of Plaintiffs and the Class on all claims;

c) Order Defendants to abate the nuisance, including an abatement order enjoining Defendants from operating their Facilities unless they can do so in such a way that the harms to Plaintiffs and the Class described herein cease entirely;

d) Award Plaintiffs and the Class applicable loss of use and enjoyment, diminution in value, and discomfort damages up to the date of abatement;

e) Award Plaintiffs and the Class damages for the permanent diminution in the fair market values of the Class properties;

f) Award any other actual, exemplary, compensatory, statutory, and consequential damages, along with punitive or treble, available at law or equity;

g) Award Plaintiffs the costs of this action, including reasonable attorneys' fees and expenses and expert fees, as allowed by law;

h) Award pre-judgment and post-judgment interest at the highest rate allowed by law; and

i) Award such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: September 23, 2026 Respectfully submitted,

By: *Mark. P. Chalos*

Mark P. Chalos (BPR#19328)
mchalos@lchb.com
Ellie E. Olson (BPR#43178)
eolson@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 2nd Avenue South, Suite 1640
Nashville, TN 37201-2379
Telephone: 615.313.9000
Facsimile: 615.313.9965

Wilson M. Dunlavey (*pro hac vice* forthcoming)
wdunlavey@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: 212.355.9500

Robert J. Nelson (*pro hac vice* forthcoming)
rnelson@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008

Thomas R. Greer (BPR#24452)
tgreer@greerinjurylawyers.com
Ronald A. Young (BPR#42738)
ryoung@greerinjurylawyers.com
GREER INJURY LAWYERS PLLC
6256 Poplar Avenue
Memphis, TN 38119
Telephone: 901.617.4653